A04A2254. DEPARTMENT OF TRANSPORTATION v. BACON FARMS, L.P.

(608 SE2d 305)

PHIPPS, Judge.

The Georgia Department of Transportation (DOT) appeals a jury award of $2,064,000 to Bacon Farms, L.P., in this land condemnation case. DOT contends, among other things, that the trial court erred by allowing Bacon Farms to present evidence of the value of kaolin deposits on the land by using a "price times unit" method. We agree and reverse.

The property in question is approximately 18 acres of a 483-acre tract of farmland in Wilkinson County owned by Bacon Farms. The land contains deposits of kaolin, a type of clay that can be mined and processed for use in making paper, ceramics, fiberglass, and other products. Although Bacon Farms knew about the kaolin on its property, it had never sold or mined any of it before DOT condemned the property.

At trial, DOT presented the testimony of geologist Sam Pickering, who analyzed 13 core drilling samples from the taken property and determined that the kaolin was of relatively poor quality and would be difficult to reach and therefore cost-prohibitive to mine. Accordingly, Pickering testified that the kaolin did not enhance the value of the property.

Based on comparable sales of other property in Wilkinson County containing kaolin, DOT real estate appraiser James Lawton opined that the taken property was worth $2,500 per acre. Lawton explained that this figure included an enhanced value for the kaolin, even though Pickering had concluded that it was not marketable in the

foreseeable future. He further testified that the value of the taken property was enhanced by several temporary easements worth $2,358 and by timber worth $50,700. Thus, Lawton calculated the total value of the taken property at $97,000.

Bacon Farms presented the testimony of geologist Doral Mills, who disputed Pickering's evaluation of the quality and accessibility of the kaolin on the taken property. Mills opined that the highest and best use of the property was the mining of kaolin, and he concluded that the value of the property — as enhanced by the presence of the kaolin — was $4,705,340. Mills arrived at this figure by multiplying the estimated number of tons of kaolin on the property[1] by two different fixed prices per ton.[2] He determined those prices by analyzing lease agreements between other landowners and kaolin companies in the area which required the companies to pay a fixed royalty amount for each ton of kaolin extracted from the property.

Another Bacon Farms witness, F. Camp Bacon, Jr., performed a similar analysis. He calculated the estimated number of tons of kaolin "lost" through the taking, then multiplied that figure by several per-ton prices. As with Mills, Bacon's per-ton prices were based on royalty fees set forth in lease agreements for other kaolin property in the area. Bacon computed the value of the lost kaolin on the land at $4,508,756.

The jury returned a $2,064,000 verdict for Bacon Farms. According to affidavits from two jurors that DOT submitted with its motion for new trial, the jury reached its verdict by multiplying the number of estimated tons of minable kaolin (1,200,000) by an "average price of kaolin in the area" ($1.72 per ton).

1. DOT argues that the trial court erred by allowing Bacon Farms to present evidence calculating the value of the property by multiplying the price of a unit of kaolin by the estimated number of units of kaolin on the property. DOT contends that this "price times unit" method of valuation is improper, and we agree.

Under Georgia law, the presence of mineral deposits on condemned land is a relevant factor to be considered in determining the overall value of the property.[3] Georgia courts adhere to the widely held principle that "[l]and containing valuable deposits may be of greater market value than land without such deposits, but the land and the deposits constitute one subject matter and there cannot be

---

[1] Mills included in his calculations the estimated amount of kaolin in a "buffer zone" adjoining the taken property, which in his opinion could not be mined after the taking.

[2] Mills testified that there were essentially two grades of kaolin on the property, and he assigned two different per-unit prices for those grades.

[3] *Gunn v. Dept. of Transp.*, 222 Ga. App. 684, 685 (1) (476 SE2d 46) (1996).

separate recovery for the land and also for the deposits."[4] The courts have not specified, however, how to measure the enhanced value of mineral-rich land without separately valuing the mineral deposits.

The Court of Appeals for the Fifth Circuit discussed the issue of "price times unit" valuation in *Ga. Kaolin Co. v. United States*.[5] There, the Georgia Kaolin Company sued the federal government for damages to its land that occurred while the government was using the land as a military training base during World War II. The suit alleged that the land had become so riddled with live shells and dangerous explosives that the company could not mine the kaolin on it. The issue before the federal appeals court was the appropriate measure of damages, and the court looked to Georgia eminent domain law for guidance.

The court stated that although the presence of mineral deposits may enhance the fair market value of the land, "there can be no recovery for both the value of the land and its mineral deposits as two separate items. [Cits.]"[6] The court cited authorities that had rejected the method of computing land value by "estimating the amount of [subterranean mineral] and multiplying this amount by a fixed price per unit. [Cits.]"[7] The court then explained:

> In rejecting the method of multiplying the estimated amount of clay by a fixed price per unit, the conclusion is largely based on its speculativeness. In discussing this point, the [federal district court] said that whether or not the deposits would be mined and the royalties paid would depend upon the condition of the market, the uncertainty of the future, the demand for the product, "and many other elements, on and on, in the future."[8]

In *United States v. 83.32 Acres of Land*,[9] the Fifth Circuit clarified its holding in *Ga. Kaolin Co.* In *83.32 Acres of Land*, the government condemned "land underlain by extensive deposits of phyllitic clay, an important raw material in the landowner's manu-facture of sewer pipe, tile, and related vitreous products."[10] The government appealed the federal district court's condemnation award,

---

[4] Id., citing *Southern R. Co. v. Miller*, 94 Ga. App. 701, 704 (1) (96 SE2d 297) (1956); see also *Dept. of Transp. v. Brooks*, 153 Ga. App. 386, 390-391 (5) (265 SE2d 610) (1980).

[5] 214 F2d 284 (5th Cir. 1954).

[6] Id. at 286.

[7] Id.

[8] Id.

[9] 480 F2d 1143 (5th Cir. 1973).

[10] Id. at 1144.

arguing that the court had violated the holding of *Ga. Kaolin Co.* "by multiplying the number of tons of phyllite recoverable from the tract by the royalty per ton."[11] The Fifth Circuit rejected this argument "because it misconceives the manner in which the court below computed the award."[12] According to the Fifth Circuit, the district court had taken a conservative estimate of the recoverable reserves of phyllite and multiplied that figure by nine cents per ton to arrive at the condemnation award.

> The nine cent figure was *not* a royalty to be paid in connection with a lease of the minerals. Rather, it represented the accepted method of calculating the value of a fee simple interest in the land itself, as opposed to the value of the minerals, and was derived by taking one-half of a reasonable royalty per ton (twenty-five cents per ton) and making further deductions for the cost of mining and transportation. . . . Thus, the trial court did not follow the method of computing damages that we condemned in *Georgia Kaolin*, supra, by multiplying a per-ton royalty by the estimated reserves.[13]

We agree with the reasoning of the Fifth Circuit. The value of land containing mineral deposits cannot be determined simply by multiplying the estimated number of units of the mineral by a fixed, projected royalty per unit. This is because, in the words of the Supreme Court of Pennsylvania, "First, the minerals may not be valued separately apart from the remainder of the tract. Second, it is impossible to determine how much [the minerals] will be worth until [they have] been removed from the earth and processed for market."[14]

Nevertheless, evidence of the quantity and value of minerals on the land *is* admissible — along with all other relevant evidence — to determine the value of the land as a whole. In other words, while "price times unit" is not itself the proper measure of damages, the unit price and quantity of the minerals are factors upon which an opinion of fair market value may be based. As the Supreme Court of New Hampshire has stated,

---

[11] Id.

[12] Id.

[13] Id.

[14] *Werner v. Commonwealth*, 432 Pa. 280, 286-287 (247 A2d 444) (1968); see also *Bd. of County Supervisors of Henrico County v. Wilkerson*, 226 Va. 84, 89 (307 SE2d 450) (1983) (rejecting unit times royalty method of valuation because result is based upon speculation as to continuing existence of theoretical future market).

We adhere to the principle that the unit rule is not the measure of damage, but the use of pencil and paper and computation is not proof of impropriety. The amount and value of recoverable mineral deposits are not only proper but necessary elements to be considered in determining before and after value.[15]

The Supreme Court of Nevada has reached a similar conclusion:

It is recognized that a fair estimation of value cannot be reached simply by multiplying the unit market price of a given mineral by the estimated quantity thereof contained in the condemned land. Many other factors need be considered before fair value can be attached to the mineral bearing property. But, where the product of the price-unit formula is considered only as one of such factors, no prejudicial error results. [Cit.][16]

In this case, both Mills and Bacon computed the value of the land by multiplying the estimated tons of "lost" kaolin by projected unit prices per ton. Those unit prices were averages of per-ton royalty fees set forth in leases of other kaolin properties in the area. Bacon Farms argues that this method of valuation was expressly approved by the Fifth Circuit in *83.32 Acres of Land*. But unlike the trial court in that case, Mills and Bacon apparently made no deductions or other allowances for the cost of mining and transportation of the kaolin, nor did they account for future market uncertainties. Rather, they simply averaged the royalty fees from existing lease agreements, with no reductions. Thus, their calculations were exactly the sort of speculative, inadmissible evidence that the Fifth Circuit forbade in *Ga. Kaolin Co.* The trial court should have excluded such evidence.

2. DOT contends that the trial court erred by allowing Bacon Farms to present improper evidence of consequential damages. "Consequential damages in a partial taking of property are shown by the difference between the fair market value of the remaining property prior to the taking and the fair market value of the remaining property after the taking."[17] Mills and Bacon did not follow this method. Instead, they testified only about the value of kaolin that would be "lost" as a result of a necessary buffer zone surrounding the

---

[15] (Citation and punctuation omitted.) *Dow v. State*, 107 N.H. 512, 516 (226 A2d 92) (1967).

[16] *State of Nevada v. Nevada Aggregates & Asphalt Co.*, 92 Nev. 370, 375 (551 P2d 1095) (1976).

[17] (Citation omitted.) *Dept. of Transp. v. Morris*, 263 Ga. App. 606, 608 (1) (588 SE2d 773) (2003).

taken property. This was not a proper measure of consequential damages.

3. DOT argues that the trial court erred by denying its motion to compel discovery from a former expert witness of Bacon Farms, Ted Smith, who apparently had information about sales of comparable kaolin property in the area. DOT asserts that Smith's information would have supported its valuation of the taken property. The court refused to compel the discovery because Smith had withdrawn as an expert in the case, Bacon Farms had stipulated that it would not use Smith's information, and DOT had not shown any exceptional circumstances warranting an order compelling discovery of the information.[18]

Trial courts have broad discretion to determine what is discoverable, and we will not interfere with that discretion absent clear abuse.[19] We find no abuse here, particularly in light of the fact that DOT could have subpoenaed Smith to testify at trial.[20]

4. We do not address DOT's remaining claims of error because they are not likely to recur on retrial.

*Judgment reversed. Smith, C. J., and Johnson, P. J., concur.*

DECIDED DECEMBER 10, 2004 — 

*Thurbert E. Baker, Attorney General, R. O. Lerer, Senior Assistant Attorney General, Avant & Evans, Irwin B. Evans, Capers, Dunbar, Sanders & Bruckner, Paul H. Dunbar III, Sell & Melton, John A. Draughon, for appellant.*

*Boone, Scott & Boone, Joseph A. Boone, Tom W. Daniel, for appellee.*

---

[18] See OCGA § 9-11-26 (b) (4) (B).

[19] *Dikeman v. Mary A. Stearns, P.C.,* 253 Ga. App. 646, 647 (1) (560 SE2d 115) (2002).

[20] See *Logan v. Chatham County,* 113 Ga. App. 491, 491-492 (1) (148 SE2d 471) (1966).